UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WALTRINA MIDDLETON, | ) | Case No.: 1:19 CV 1899 |
| | ) | |
| Plaintiff | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED CHURCH OF CHRIST | ) | |
| BOARD, *et al.*, | ) | |
| | ) | |
| Defendants | ) | ORDER |

Currently pending before the court in the above-captioned case is Defendant United Church of Christ Board ("UCC") and Defendant Local Church Ministries' ("LCM") (collectively, "Defendants") Motion to Dismiss ("Motion"). (ECF No. 4.) For the following reasons, the court grants the Motion.

## I.  BACKGROUND

### A.    Factual Background

In November 2010, Defendants hired Plaintiff Waltrina Middleton ("Plaintiff" or "Middleton") as their Minister for Youth Advocacy and Leadership Formation. (Compl. ¶ 1, ECF No. 1.) Over the next few years, Middleton alleges, she experienced several incidents of gender and racial harassment. First, a constituent told Middleton: "I thought you only got the job because you are young, black and from Trinity [United Church of Christ in Chicago]." (*Id.* ¶ 12.) Second, a

supervisor called Middleton a "sassy, young, African American woman." (*Id.* ¶ 15.) Third, another employee refused to communicate with Middleton and spread false information about Middleton's work. (*Id.* ¶ 16.) Fourth, when Middleton complained about biases and stereotypes among Defendants' managerial staff, Middleton's supervisor advised her to "work harder to get along with persons holding racist, sexist and discriminatory views because of the money they give to Defendants." (*Id.* ¶ 17.) Finally, Middleton alleges that her supervisor engaged in "rude, unprofessional, and insensitive conduct" during a meeting regarding Middleton's advocacy at the 2015 General Synod. (*Id.* ¶ 18.) When Middleton stated she wanted to report her concerns to Defendants' human resources department, her supervisor allegedly responded: "Go right ahead. You take everything else to HR." (*Id.*) Middleton claims she reported these issues to the human resources director and LCM's executive officer, but Defendants did nothing to address them. (*Id.* ¶ 19.)

In August 2015, over objections from a group of UCC leaders across the country, Defendants demoted Middleton to Minister of Faith Formation: Generational Ministries Curator—Youth and Adults. (*Id.* ¶¶ 20, 22.) When discussing the demotion, Middleton's supervisor stated: "To relieve any unnecessary anxiety upfront, you have a job here. This conversation is not leading to a notice of a RIF or termination." (*Id.* ¶ 25.) Yet Defendants demoted Middleton again a month later, this time to Associate for National Youth Event Programming, a temporary position slated to end in August 2016. (*Id.* ¶¶ 23, 29.) Defendants also cut short Middleton's sabbatical, which had been scheduled to begin on October 1, 2015. (*Id.* ¶ 24.) Though Defendants previously approved two months of leave, they required Middleton to return to work after just two weeks. (*Id.*) Then, on June 27, 2016, Defendants terminated Middleton's employment. (*Id.* ¶ 30.) The parties' filings do not provide additional detail regarding the timing of Defendants' decision to terminate Middleton or their reasons for doing so. (*See id.*; Mot. at PageID #23, ECF No. 4.)

In addition, Middleton alleges that, throughout her employment, Defendants consistently hired or promoted white employees over Middleton despite their lack of experience and qualifications. (*See* Compl. ¶¶ 13, 26, 28, ECF No. 1.)

## B.    Procedural History

On January 26, 2017, roughly seven months after her dismissal, Middleton filed a dual administrative complaint with the Ohio Civil Rights Commission ("OCRC") and Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶¶ 2, 5.) The EEOC issued a right-to-sue letter in May 2019. (Ex. A, ECF No. 1-1.) Middleton then filed a Complaint in this court on August 21, 2019, alleging three causes of action: (1) race and gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and Ohio Rev. Code § 4112; (2) breach of contract; (3) and promissory estoppel. (Compl. ¶¶ 5, 34–50, ECF No. 1.) In lieu of an answer, Defendants filed a Motion to Dismiss (ECF No. 4) on October 21, 2019. Middleton filed a Response in Opposition (ECF No. 7) on November 20, 2019, and Defendants filed their Reply (ECF No. 8) on December 4, 2019.

## II.  LEGAL STANDARD

The court examines the legal sufficiency of a plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6). The Supreme Court clarified the law regarding what a plaintiff must plead to survive a Rule 12(b)(6) motion in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). To determine whether the plaintiff stated a claim upon which relief can be granted, the court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of

action will not do." *Id.* at 555. While a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the Complaint are true." *Id.* A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). In *Iqbal*, the Supreme Court further explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. at 678. This "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Assessing plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Generally, when ruling on a Rule 12(b)(6) motion to dismiss, the court must limit its analysis to the allegations in the complaint. *See Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997) ("Matters outside of the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss."). Thus, if a defendant attaches materials outside of the pleadings, the court must exclude those materials or treat the motion as one for summary judgment under Federal Rule of Civil Procedure 56 after giving the parties "a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see also Greenberg v. Life Ins. Co.*, 177 F.3d 507, 514 (6th Cir. 1999). However, documents attached to a Rule 12(b)(6) motion are considered part of the pleadings—which makes conversion to a summary judgment motion unnecessary—if the documents are referenced in the complaint and central to the plaintiff's claim. *See Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001); *see also* Fed. R. Civ. P. 10(c). This prevents "a plaintiff with a legally deficient claim" from "surviv[ing] a motion to dismiss simply by failing to attach a dispositive document on which it relied." *Weiner*, 108 F.3d at 89.

### III.  LAW AND ANALYSIS

Defendants ask the court to dismiss the Complaint pursuant to Rule 12(b)(6). Specifically, Defendants argue that the ministerial exception articulated in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012), constitutes a complete bar to Middleton's claims. (Mot. at PageID #23, 25–31, ECF No. 4.) Alternatively, Defendants assert that dismissal is required because, even if the ministerial exception does not apply, the Complaint otherwise fails to state a claim upon which relief can be granted. (*Id.* at PageID #31–35; Reply at PageID #65–68, ECF No. 8.) The court addresses these arguments in turn.

**A.    Ministerial Exception**

The Supreme Court has recognized a "ministerial exception" that shields religious employers from employment discrimination lawsuits brought by their ministers. *Hosanna-Tabor*, 565 U.S. at 188–89. Rooted in the First Amendment's Establishment and Free Exercise Clauses, this exception "ensures that the authority to select and control who will minister to the faithful—a matter strictly ecclesiastical—is the church's alone." *Id.* 194–95 (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 119 (1952)) (cleaned up). The courts of appeals had already widely embraced the ministerial exception before the Supreme Court adopted it in *Hosanna-Tabor*. 565 U.S. at 188 ("Since the passage of Title VII . . . and other employment discrimination laws, the Courts of Appeals have uniformly recognized the existence of a 'ministerial exception,' grounded in the First Amendment, that precludes application of such legislation to claims concerning the employment relationship between a religious institution and its ministers."). But while lower courts had extended the ministerial exception to other contexts beyond federal employment discrimination statutes, *Hosanna-Tabor* expressly declined to do so. *Id.* at 196 ("We express no view on whether the exception bars other types of suits, including actions by employees

alleging breach of contract or tortious conduct by their religious employers.").

For the ministerial exception to apply, "the employer must be a religious institution and the employee must have been a ministerial employee." *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 833 (6th Cir. 2015) (quoting *Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 225 (6th Cir. 2007)). Here, the parties agree that Defendants are a religious institution and that Middleton was a ministerial employee. (Mot. at PageID #25–30, ECF No. 4; Opp'n at PageID #48, ECF No. 7.) Consequently, the ministerial exception applies and bars Middleton from pursuing an employment discrimination claim arising from any tangible employment actions Defendants took against her. *See Hosanna-Tabor*, 565 U.S. at 196. However, the parties disagree whether the ministerial exception applies to Middleton's hostile work environment claim or her common law claims.

### 1. Affirmative Defense

Before proceeding to the merits of Defendants' argument, the court notes that the ministerial exception operates as an affirmative defense, *Hosanna-Tabor*, 565 U.S. at 195 n.4, and that, typically, a Rule 12(b)(6) motion to dismiss is not the proper vehicle to assert an affirmative defense. However, the Sixth Circuit has stated that "[t]he ministerial exception is an affirmative defense that [defendants] should first assert in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Conlon*, 777 F.3d at 833. This comports with the rule in this Circuit allowing defendants to raise an affirmative defense in a pre-answer motion to dismiss "where the defense clearly appears on the face of the [complaint]." *Pierce v. Oakland Cty.*, 652 F.2d 671, 672 (6th Cir. 1981); *see also Siefert v. Hamilton Cty.*, 951 F.3d 753, 761–62 (6th Cir. 2020) (holding that qualified immunity can be resolved in a motion to dismiss "when the complaint establishes the defense"); *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) ("[S]ometimes the allegations in the complaint affirmatively show that the claim is time-barred. When that is the case, . . . dismissing the claim

under Rule 12(b)(6) is appropriate."); *Reid v. Baker*, 499 F. App'x 520, 524 (6th Cir. 2012) (similar). Such is the case here, where the Complaint clearly establishes that Middleton was a ministerial employee, Defendants are a religious institution, and the allegations involve employment discrimination. Moreover, Middleton does not challenge Defendants' invocation of the ministerial exception via a Rule 12(b)(6) motion to dismiss. Thus, this defense is properly before the court.

### 2. Hostile Work Environment

Middleton's first cause of action alleges that "Defendants violated Plaintiffs' [sic] rights under Title VII and O.R.C. Chapter 4112 when they subjected her to harassment based on her race and gender and retaliated against her for engaging in protected activity." (Compl. ¶ 35, ECF No. 1.) Read in context with the rest of the Complaint—the bulk of which focuses on Middleton's demotions and eventual termination—this cause of action is fairly interpreted as challenging the tangible employment actions Defendants took against Middleton. (*See, e.g.*, *id.* ¶ 32 ("There exists a causal connection between Plaintiff's race, her gender, her complaints of racism, sexism and harassment and Defendants' harassment of her, their retaliatory treatment of her and their decision to demote her and terminate her employment.").) But after Defendants raised the ministerial exception in their Motion to Dismiss, Middleton conceded that the exception bars "inquiry into [Defendants'] reasons for demoting and then firing her." (Opp'n at PageID #48, ECF No. 7.)

However, with a quick pivot, Middleton's Response in Opposition clarifies that her first cause of action actually "is based on the hostile work environment to which Defendants subjected her because she is an African American female, separately and apart from the tangible employment actions they took against her." (*Id.*) She maintains that this claim survives because the ministerial exception "does not bar inquiry into whether she was subjected to a hostile work environment (harassed) for discriminatory and/or retaliatory reasons while she was still employed." (*Id.* at

-7-

PageID #48–49.) Middleton's argument relies on the Supreme Court's statement in *Hosanna-Tabor* that the Court "express[ed] no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers." 565 U.S. at 196. She also cites two favorable cases from another district. *See Demkovich v. St. Andrew the Apostle Parish*, 343 F. Supp. 3d 772, 785 (N.D. Ill 2018) ("If a minister's hostile-environment claim does not challenge a tangible employment action and does not pose excessive entanglement with the religious employer, then the ministerial exception should not apply."); *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 872 (N.D. Ill. 2019) (finding that ministers can pursue employment discrimination claims if they are unrelated to religious doctrine).

The issue Middleton's argument raises—whether the ministerial exception applies to a minister's hostile workplace claims—is both a question of first impression in this Circuit and the subject of a circuit split. As *Demkovich* acknowledged, "[o]nly two courts of appeals have addressed whether hostile work environment claims brought by a minister are barred by the ministerial exception," and they "have come to opposite conclusions." 343 F. Supp. 3d at 783. On the one hand, the Tenth Circuit interpreted the exception to broadly prohibit all employment discrimination claims because "any Title VII action brought against a church by one of its ministers will improperly interfere with the church's right to select and direct its ministers free from state interference." *Skrzypczak v. Roman Catholic Dioceses of Tulsa*, 611 F.3d 1238, 1245 (10th Cir. 2010) (holding that minister's hostile workplace claim would cause significant entanglement in church's autonomy and core functions). On the other hand, in a case involving a minister's sexual harassment claims against her supervisor, the Ninth Circuit held that ministers can bring hostile workplace claims if the alleged harassment is unrelated to religious doctrine. *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 959 (9th Cir. 2004) (holding that a minister's employment discrimination claims can survive if they

"do not require interpretations of religious doctrine or scrutiny of . . . ministerial choices," but emphasizing that religious employers can defend their actions by showing "doctrinal reasons for tolerating or failing to stop the . . . harassment").

The Sixth Circuit has not squarely addressed this issue, but its decisions in similar cases interpreting the ecclesiastical abstention doctrine are instructive. The ministerial exception is one branch of the ecclesiastical abstention doctrine, which is also referred to as the church autonomy doctrine. *Ogle v. Hocker*, 279 F. App'x 391, 395 (6th Cir. 2008) (citing *Lewis v. Seventh Day Adventists Lake Region Conf.*, 978 F.2d 940, 942 (6th Cir.1992)). While the ministerial exception applies specifically to a religious institution's employment decisions, the ecclesiastical abstention doctrine applies more broadly and prohibits secular courts from adjudicating religious controversies involving "questions of discipline, or of faith, or ecclesiastical rule, custom, or law." *Serbian E. Orthodox Diocese for U.S. and Can. v. Milivojevich*, 426 U.S. 696, 710 (1976) (quoting *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727 (1871)). Given the significant overlap between these doctrines, the Sixth Circuit has interpreted them using a common set of cases and largely interchangeable reasoning.

In *Ogle*, for example, the Sixth Circuit acknowledged the relationship between the two doctrines and incorporated reasoning from *Elvig*—the Ninth Circuit's ministerial exception case—to explore the scope of ecclesiastical abstention. *See Ogle*, 279 F. App'x at 395–96. The dispute involved one minister's allegations of defamation and intentional infliction of emotional distress against another minister of the same church. *Id.* at 394–95. The defendant minister argued the case had to be dismissed due to the ecclesiastical abstention doctrine, and the district court agreed. *Ogle v. Hocker*, No. 02-73200, 2005 WL 1349111, at *4 (E.D. Mich. Mar. 11, 2005). But on appeal, the Sixth Circuit reversed and remanded. It held that "[w]hether a secular court may hear a tort suit

-9-

despite the church autonomy doctrine" is a fact-intensive inquiry that "turns on the availability of secular standards and the ability of a court to resolve the controversy without reference to religious doctrine." *Id.* at 395 (citing *Elvig*, 375 F.3d at 959). And because the plaintiff minister's claims could "be resolved through application of secular standards without any impingement upon church doctrine or practice," dismissal was not appropriate. *Ogle*, 279 F. App'x at 396. In reaching this conclusion, the Sixth Circuit analogized that, "like the inquiry into a hostile work environment in *Elvig*, the laws of defamation and intentional infliction of emotional distress (when based on defamation) can be applied based solely on secular rules." *Id.* at 395.

By explicitly incorporating *Elvig*'s reasoning, the Sixth Circuit's decision in *Ogle* endorses a view of the ministerial exception in line with the Ninth Circuit's approach. Other Sixth Circuit cases similarly support limiting the ministerial exception to claims challenging tangible employment actions. *See Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 409 (6th Cir. 2010) (explaining "[t]he ministerial exception is a highly circumscribed doctrine" that "grew out of the special considerations raised by the employment claims of clergy"). Because the Supreme Court expressly limited its decision in *Hosanna-Tabor* to tangible employment actions, and because the Sixth Circuit has not extended the ministerial exception further, Defendants' attempt to pull hostile workplace claims within the ambit of the ministerial exception constitutes an invitation to go beyond what controlling law requires. The court declines that invitation.

Accordingly, the court concludes that a minister's hostile work environment claim can survive the ministerial exception—at least when the claim does not entail excessive entanglement with religious matters. And after examining Middleton's first cause of action, the court concludes that it does not implicate "any matters of church doctrine or practice." *Ogle*, 279 F. App'x 396. As discussed below, Middleton's hostile workplace claim involves allegations of racial and gender

harassment that are wholly unrelated to Defendants' religious teachings. Defendants do not claim that such insults are part of UCC policies or religious beliefs. Nor do Defendants offer any other explanation in response to Middleton's allegations. (*See* Mot. at PageID #25–30, ECF No. 4; Reply at PageID #64–65, ECF No. 8.) Consequently, because ruling on Middleton's hostile workplace claim would not require the court to delve into religious doctrine or other ecclesiastical domains, the court finds that the ministerial exception does not apply to Middleton's first cause of action.

### 3.  Breach of Contract and Promissory Estoppel

Defendants also argue that the ministerial exception bars Middleton's breach of contract and promissory estoppel claims. (Mot. at PageID #30–31, ECF No. 4; Reply at PageID #9–10, ECF No. 8.) They assert that "the ministerial exception is based on the First Amendment and thus its application is not limited to claims arising under Title VII." (Mot. at PageID #30, ECF No. 4.) But Middleton maintains that "it is an open question whether the ministerial exception bars common law claims challenging a religious organization's tangible employment actions" because the "Supreme Court refrained from so holding in *Hosanna-Tabor*, and no clear Sixth Circuit precedent has gone further." (Opp'n at PageID #56, ECF No. 7.)

After reviewing existing Circuit precedent, the court concludes that the ministerial exception does apply to a minister's common law claims challenging tangible employment actions. This rule has its roots in *Hutchison v. Thomas*, 789 F.2d 392 (6th Cir. 1986), and *Lewis v. Seventh Day Adventists Lake Region Conf.*, 978 F.2d 940 (6th Cir. 1992). In both cases, the plaintiff ministers brought common law claims, such as breach of contract, promissory estoppel, and various torts, against their churches. *Hutchison*, 789 F.2d at 393; *Lewis*, 978 F.2d at 941. And in both cases, the Sixth Circuit applied the ministerial exception and affirmed the district courts' dismissal because the claims concerned the plaintiffs' status and employment as ministers, which necessarily implicates

-11-

"internal church discipline, faith, and organization, all of which are governed by ecclesiastical rule, custom, and law." *Lewis*, 978 F.2d at 942 (quoting *Hutchison*, 789 F.2d at 396); *see also Hollins*, 474 F.3d at 225 (acknowledging the ministerial exception applies to "common law claims brought against a religious employer"); *Ogle v. Church of God*, 153 F. App'x 371, 376 (6th Cir. 2005) (affirming dismissal of minister's "breach of implied contract, tortious interference with business relationships, conspiracy, invasion of privacy, and defamation" claims because they implicated church's "internal disciplinary proceedings"); *Ogle*, 279 F. App'x at 395 n.3 (noting the ministerial exception would bar a minister's defamation claim if the damages inquiry required "consideration of whether the defamation caused the [tangible] employment actions, thereby inviting an exploration of the church's motive").

This conclusion holds despite some tension with subsequent authority. First, while *Hosanna-Tabor* endorsed the ministerial exception only with respect to employment discrimination suits, the Supreme Court expressly left open the possibility of applying the exception in other contexts. 565 U.S. at 196 ("There will be time enough to address the applicability of the exception to other circumstances if and when they arise."). Second, although the Sixth Circuit has since been reluctant to expand the ministerial exception to new areas, *Lewis* and *Hutchison* remain good law. In *McGill*, for example, the Sixth Circuit refused "to create an analog to the ministerial exception under trademark law." 617 F.3d at 409. But in doing so, the Sixth Circuit discussed *Hutchison* and recognized its continuing validity. *Id.* More recently, a concurring opinion in *Conlon* stressed that the majority's decision did not resolve "whether a religious employer could enter into a judicially-enforceable employment contract with a ministerial employee not to fire that employee on certain grounds (such as pregnancy)" because the plaintiff minister had "disavow[ed] any contractual argument." *Conlon*, 777 F.3d at 838 (Rogers, J., concurring). But the concurring opinion

-12-

is not controlling law. Further, as in *Hosanna-Tabor*, this limiting language did not prohibit application of the ministerial exception to common law claims; it merely clarified that common law claims were not at issue in that case. Finally, even though courts now apply the ministerial exception as an affirmative defense rather than a limit on jurisdiction, the Sixth Circuit's understanding of the exception continues to rest on *Hutchison*'s reasoning. *See EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 581 (6th Cir. 2018) (acknowledging *Hutchison* and reciting the familiar explanation that the ministerial exception "grew out of the special considerations raised by the employment claims of clergy, which 'concern[] internal church discipline, faith, and organization, all of which are governed by ecclesiastical rule, custom, and law'").

In short, *Hutchison* and *Lewis* control. *See Lee v. Sixth Mt. Zion Baptist Church*, 903 F.3d 113, 122 (3d Cir. 2018) (citing *Hutchison*, *Lewis*, and cases from the First and Fourth Circuits to show that "sister circuit courts have repeatedly dismissed breach of contract claims asserted by terminated religious leaders against their religious institution employers based on the ministerial exception"). Accordingly, in this Circuit, when a ministerial employee asserts common law claims challenging a tangible employment action or otherwise implicating their "status and employment as a minister," the ministerial exception applies. *Hutchison*, 789 F.2d at 396. Other federal courts have reached the same conclusion. *See Lee*, 903 F.3d at 123 ("[W]e are not aware of any court that has ruled on the merits (i.e., not applied the ministerial exception) of a breach of contract claim alleging wrongful termination of a religious leader by a religious institution."); *Rodarte v. Apostolic Assembly of the Faith in Christ Jesus*, No. CV H-10-4181, 2012 WL 12893656, at *4 (S.D. Tex. Feb. 29, 2012) (recognizing applicability of ministerial exception to common law claims when the claims "hinge on a religious organization's ability to terminate a church employee or minister").

Looking to the allegations in Middleton's Complaint, the court concludes that resolving her second and third causes of action would cause excessive entanglement with religion. For example, Middleton alleges that her demotion served as "punish[ment] for being outspoken about [her] concerns and also because during General Synod [she] lifted up social justice issues that some groups were not comfortable with as it pertains to addressing racism and sexual orientation." (Compl. ¶ 21, ECF No. 1 (alterations in original omitted).) In other words, Middleton asserts that Defendants disciplined her because they were uncomfortable with her advocacy at a major UCC religious event. Her other demotions and termination involve similar allegations. Thus, to resolve Middleton's claims, the court would have to evaluate the motive and reasoning behind Defendants' decision to terminate her employment as a minister, which is precisely the type of intrusion on "internal church discipline, faith, and organization" that the ministerial exception prohibits. *Hutchison*, 789 F.2d at 396.

Finally, the court is not persuaded by Middleton's argument that her common law claims survive the ministerial exception simply because they allege "collusion by white employees to demote and then oust Middleton for racist and sexist reasons." (Opp'n at PageID #56, ECF No. 7.) Middleton cites only one case to support the existence of this "fraud or collusion" exception to the ministerial exception. (*See id.* (citing *Hutchison*, 789 F.2d at 393).) And in that case, the Sixth Circuit explained it was "[a]ssuming, without deciding, that review is allowed for fraud or collusion." *Hutchinson*, 789 F.2d at 395. Moreover, even if this exception exists, it is reserved for "fraud or collusion of the most serious nature undermining the very authority of the decision-making body." *Id.*; *see also Smith v. White*, 7 N.E.3d 552, 569 (Ohio Ct. App. 2014) (holding that concealing financial misappropriation did not trigger fraud or collusion exception); *Moon v. Moon*, 431 F. Supp. 3d 394, 414 n.28 (S.D.N.Y. 2019) ("Plaintiff fails to cite (and this Court has been unable to identify)

-14-

a single case applying the 'fraud or collusion' exception."). At most, Middleton asserts that Defendants fired her over objections from other UCC leaders. (Compl. ¶ 22, ECF No. 1.) Without more, Middleton's allegations do not show "fraud or collusion of the most serious nature." *Hutchinson*, 789 F.2d at 395.

Consequently, the court finds that the ministerial exception bars Middleton's breach of contract and promissory estoppel claims. Therefore, they must be dismissed.

**B.      Failure to State a Claim**

In the alternative, Defendants urge the court to dismiss the Complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. (*See* Mot. at PageID #31–35, ECF No. 4; Reply at PageID #65–68, 71–72, ECF No. 8.) The court finds this argument well-taken with respect to Middleton's first cause of action. And for the sake of completeness, the court notes that it also would dismiss Middleton's second and third causes of action under Rule 12(b)(6) if those claims were not barred by the ministerial exception.

1.  Hostile Work Environment

To maintain a hostile work environment claim under Title VII, the victimized employee must allege that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[1] *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 309 (6th Cir. 2016) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Courts look to the totality of the

---

[1]      The same principles govern hostile work environment claims under Ohio law. *Greer-Burger v. Temesi*, 879 N.E.2d 174, 180 (Ohio 2007) ("Because Ohio's own antidiscrimination laws found in R.C. Chapter 4112 are modeled after Title VII, . . . federal case law interpreting Title VII . . . is generally applicable to cases involving alleged violations of R.C. Chapter 4112."); *see also Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio C.R. Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981).

circumstances to assess such claims. While "[t]here are no hard and fast rules as to how much harassment is enough harassment to qualify as severe or pervasive," *Parker v. Strawser Constr., Inc.*, 307 F. Supp. 3d 744, 757 (S.D. Ohio 2018), "[t]he Supreme Court has provided a non-exhaustive list of factors to consider when deciding whether a hostile work environment exists including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance,'" *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008) (quoting *Harris*, 510 U.S. at 23 (emphasis omitted)).

To support her claim, Middleton recounts several incidents that allegedly occurred during her employment. First, in November 2010, shortly after Middleton began working for Defendants, a constituent told Middleton: "I thought you only got the job because you are young, black and from Trinity [United Church of Christ in Chicago]." (Compl. ¶ 12, ECF No. 1.) Next, more than three years later, in February 2014, a supervisor allegedly called Middleton "a sassy, young, African American woman." (*Id.* ¶ 15.) The following month, Middleton complained that another employee refused to communicate and was spreading falsehoods about Middleton's job performance. (*Id.* ¶ 16.) Shortly thereafter, a supervisor allegedly told Middleton that "she should work harder to get along with persons holding racist, sexist and discriminatory views because of the money they give to Defendants." (*Id.* ¶ 17.) Finally, in August 2015, Middleton's supervisor allegedly exhibited "rude, unprofessional, and insensitive conduct" and accused Middleton of "tak[ing] everything [] to HR" during a meeting regarding Middleton's job performance. (*Id.* ¶ 18.) Because Middleton's hostile workplace claim does not challenge any tangible employment actions, her first cause of action rests solely on these five incidents. (*See* Opp'n at PageID #48, ECF No. 7 ("[Middleton's] first claim is based on the hostile work environment to which Defendants subjected her because she is an African

-16-

American female, *separately and apart from the tangible employment actions they took against her*." (emphasis added)).)

Taking these allegations as true and considering them in the light most favorable to Middleton, the court concludes that the Complaint fails to state a plausible claim for hostile work environment. While Middleton describes interactions that are unprofessional and unpleasant, none of the alleged conduct was physically threatening or humiliating. At most, these sporadic comments constituted "offensive utterances," which "do not rise to the level required by the Supreme Court's definition of a hostile work environment." *Grace*, 521 F.3d at 679; *see also Harris*, 510 U.S. at 21 ("[M]ere utterance of an . . . epithet which engenders offensive feelings in an employee . . . does not sufficiently affect the conditions of employment to implicate Title VII"); *Wade v. Automation Pers. Servs., Inc.* 612 F. App'x 291, 298 (6th Cir. 2015) (holding that calling African-American employees by nicknames from "The Help" was socially repulsive but not actionable). That these incidents occurred sporadically over five years further undermines Middleton's claim. *See Burnett v. Tyco Corp.* 203 F.3d 980, 983 (6th Cir. 2000) (holding that comments made over the course of six months were not severe or pervasive). Indeed, in this Circuit, courts have found hostile work environment claims lacking "where the offensive conduct 'was not a daily or even weekly event.'" *Parker*, 307 F. Supp. 3d at 758 (quoting *Kelly v. Senior Ctrs., Inc.*, 169 F. App'x 423, 429 (6th Cir. 2006)); *see also Bourini v. Bridgestone/Firestone N. Am. Tire, LLC*, 136 F. App'x 747, 751 (6th Cir. 2005) (rejecting hostile work environment claim where plaintiff alleged eight incidents over a five-year period).

Because Middleton does not allege severe or pervasive conduct, her allegations do not support a plausible hostile work environment claim. Accordingly, the court grants Defendants' Motion to Dismiss as to Middleton's first cause of action.

-17-

2.  Breach of Contract

Middleton's second cause of action alleges that Defendants breached their employment contract with Middleton. (Compl. ¶¶ 38–43, ECF No. 1.) To plead a breach of contract claim under Ohio law, a plaintiff must state "(1) the terms of the contract, (2) the performance by the plaintiff of his obligations, (3) the breach by the defendant, (4) damages, and (5) consideration." *Wells Fargo Bank, N.A. v. Favino*, No. 1:10-CV-571, 2011 WL 1256771, at *9 (N.D. Ohio Mar. 31, 2011) (quoting *American Sales, Inc. v. Boffo*, 593 N.E.2d 316, 321 (Ohio App.1991)). Middleton's Complaint fails at the first element because, even taking her allegations as true, the Complaint does not establish that a contract existed or identify what the terms of the alleged contract were.

Under Ohio law, the existence of a contract "hinge[s] upon proof of all the elements of a contract." *GEM Indus., Inc. v. Sun Trust Bank*, 700 F. Supp. 2d 915, 922 (N.D. Ohio 2010) (quoting *Stepp v. Freeman*, 694 N.E. 2d 510, 514 (Ohio Ct. App. 1997)). These elements are "offer, acceptance, consideration, and a meeting of the minds." *Randleman v. Fidelity Nat'l Title Ins. Co.*, 465 F. Supp. 2d 812, 817 (N.D. Ohio 2006). Contracts can be express or implied. When parties form an express contract, "assent to the terms of the contract is actually expressed in the form of an offer and an acceptance." *Id*. By contrast, "in implied-in-fact contracts the parties' meeting of the minds is shown by the surrounding circumstances, including the conduct and declarations of the parties, that make it inferable that the contract exists as a matter of tacit understanding." *Ramsey v. Allstate Ins. Co.*, 514 F. App'x 554, 558 (6th Cir. 2013) (quoting *Stepp*, 694 N.E. at 514); *see also Hercules Inc. v. United States*, 516 U.S. 417, 424 (1996) ("An agreement implied in fact is founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." (internal quotation marks omitted)).

-18-

In this case, Middleton's breach of contract claim relies on a single statement her supervisor made in August 2015: "To relieve any unnecessary anxiety upfront, you have a job here. This conversation is not leading to a notice of a RIF or termination." (Compl. ¶ 25, ECF No. 1; *see also* Opp'n at PageID #58, ECF No. 7.) Middleton asserts that "[t]here could have been no clearer promise of job security" and that this statement created "an employment contract between Plaintiff and Defendants whereby she would not be demoted or terminated in the absence of just cause." (Opp'n at PageID #58, ECF No. 7.) In other words, Middleton claims that this one statement transformed her at-will employment into a contract requiring dismissal for cause, which Defendants breached when they subsequently fired her. (*Id.*) Defendants, however, argue that Middleton offers "no allegations to reflect that there was any sort of meeting of . . . the minds, nor did [the] parties agree to terms that were definite and certain." (Mot. at PageID #32–33, ECF No. 4.) Because the allegations amount to a "vague statement that contains no definite terms of employment," Defendants urge the court to dismiss the breach claim. (*Id.* at PageID #32.)

Defendants' argument is well-taken. Ohio law has "a strong presumption in favor of a contract terminable at will." *Burrows v. Fuyao Glass Am. Inc.*, No. 3:17-CV-186, 2017 WL 6262189, at *5 (S.D. Ohio Dec. 8, 2017). Nothing in Middleton's Complaint reflects an agreement that overcomes this presumption. Middleton's allegations do not identify any express agreement among the parties. Nor do the facts and circumstances allow the court to construe the one vague statement from Middleton's supervisor as an offer to enter a binding for-cause employment contract. Nothing suggests that the parties had a meeting of the minds, that they agreed Middleton would remain employed for any particular length of time, or that there was consideration for the alleged promise. In short, Middleton's allegations fail to plead breach of contract under Ohio law. Therefore, even if the ministerial exception did not apply, the court would grant Defendants' Motion to Dismiss

as to Middleton's second cause of action.

### 3.  Promissory Estoppel

Middleton's final cause of action asserts promissory estoppel. (Compl. ¶¶ 44–50, ECF No. 1.) Under Ohio law, "[a] claim of promissory estoppel requires a plaintiff to plead facts showing '(1) a clear and unambiguous promise; (2) reliance upon the promise by the person to whom the promise is made; (3) the reliance is reasonable and foreseeable; and (4) the party seeking to enforce the agreement is injured as a result of its reliance.'" *Whitacre v. Nations Lending Corp.*, No. 5:19-CV-809, 2019 WL 3477262, at *6 (N.D. Ohio July 31, 2019) (quoting *Kena Props.*, *LLC v. Merchants Bank & Tr.*, 218 F. App'x 402, 406 (6th Cir. 2007)). Ohio courts have made clear that promissory estoppel requires "specific promises" and that "nebulous representations" will not do. *Stewart v. Everyware Glob., Inc.*, 68 F. Supp. 3d 759, 766 (S.D. Ohio 2014) (citing *Penwell v. Amherst Hosp.*, 616 N.E.2d 254 (Ohio Ct. App.1992)); *see also Lake v. Wolff Bros. Supply*, No. 63959, 1993 WL 462866, at *4 (Ohio Ct. App. Nov. 10, 1993) (holding that the statement,"[w]ith this kind of partnership, you will have a job until you retire," did not support promissory estoppel); *Gouge v. BAX Glob., Inc.*, 252 F. Supp. 2d 509, 513 (N.D. Ohio 2003) (finding that the statement, "I don't want you guys to worry about it, we're going to take care of you," was not specific enough for promissory estoppel).

As with her breach of contract claim, Middleton relies on the single statement from her supervisor that "you have a job here. This conversation is not leading to a notice of a RIF or termination." (Compl. ¶ 25, ECF No. 1.) Middleton maintains that this statement constituted "a promise of employment security." (Opp'n at PageID #58, ECF No. 7.) But as Defendants point out, under Ohio law, "a promise of future benefits or opportunities without a specific promise of continued employment does not support a promissory estoppel exception to the employment-at-will

doctrine." (Reply at PageID #72, ECF No. 8 (quoting *Koval v. Dow Jones & Co.*, 86 F. App'x 61, 72 (6th Cir. 2004))); *see also Wing v. Anchor Media, Ltd.*, 570 N.E.2d 1095, 1096 (Ohio 1991). Indeed, the primary case Middleton cites for support explains that "specific promises of job security must be clear and unambiguous," which means a promise that "specifically indicates the length of employment." *Melott v. ACC Operations, Inc.*, No. 2:05-CV-63, 2006 WL 1892656, at *6 (S.D. Ohio July 10, 2006) (quotation omitted).

The court finds that the statement Middleton touts cannot be interpreted as a clear and unambiguous promise of continued employment or job security. *See, e.g.*, *Kermavner v. Wyla, Inc.*, 250 F. Supp. 3d 325, 332 (N.D. Ohio 2017) ("[S]tatements are vague because no specific term of promised employment is defined."). At most, the statement conveyed a promise that Middleton would continue to have a job for the time being. And she did. Indeed, Defendants continued to employ her for nearly a year afterwards. Because Middleton's allegations fail to plead any additional promise, the court finds that her promissory estoppel claim fails to state a claim upon which relief can be granted. Consequently, even if the ministerial exception did not apply, the court would grant Defendants' Motion to Dismiss as to Middleton's third cause of action.

## C. Other Issues

### 1. Appendix A

Defendants attached copies of Middleton's job descriptions to their Motion to Dismiss. (*See* Appendix A, ECF No. 4-1.) Middleton argues that this Appendix must be stricken or else Defendants' Motion must be converted to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 12(d). (*See* Opp'n at PageID #351–53, ECF No. 7.) The court agrees. Following Middleton's clarification that she does not challenge any tangible employment actions, Appendix A is not relevant. The formal job descriptions do not bear on Middleton's hostile workplace claim,

which arises irrespective of her duties and responsibilities, or Middleton's common law claims, which concern promises of future employment rather than her prior positions. Because the documents in Appendix A are outside the pleadings, they are hereby stricken from the record. The court did not consider them in deciding this Motion.

### 2. EEOC Complaint Filing

As a final matter, Defendants assert that the court must dismiss Middleton's hostile work environment claim because it falls outside the statute of limitations prescribed by 42 U.S.C. § 2000e-5(e)(1) and Ohio Rev. Code § 4112.05(B)(1). (Reply at PageID# 68–69, ECF No. 8.) In short, Defendants argue that, because Middleton disavows any claim based on her demotions and termination, the court should exclude those events from consideration when determining the applicable filing deadline. And without those events, Middleton's Complaint rests entirely on allegations regarding actions that occurred in 2015, which makes her January 26, 2017, administrative complaints untimely. *See* 42 U.S.C. § 2000e-5(e)(1) (providing that EEOC charges "shall be filed . . . within three hundred days after the alleged unlawful employment practice occurred"); Ohio Rev. Code § 4112.05(B)(1) (providing that OCRC charges "shall be filed with the commission within six months after the alleged unlawful discriminatory practice was committed").

The court declines to address this argument. Defendants may be correct that Middleton's administrative complaints would be time barred without the tangible employment actions Defendants took against her. But the parties did not provide a copy of Middleton's administrative complaint, which makes it impossible to assess whether the tangible employment actions should be included in the timeline for statute of limitations purposes. Further, because Defendants raised this argument for the first time in their Reply, Middleton has not had a chance to respond. Consequently, the court lacks sufficient information to evaluate Defendants' argument. Regardless, it is not necessary to

resolve this issue given the conclusion above that Middleton's claims fail on other grounds.

## IV.  CONCLUSION

For the foregoing reasons, the court grants Defendants' Motion to Dismiss (ECF No. 4).

IT IS SO ORDERED.

/s/ SOLOMON OLIVER, JR.
UNITED STATES DISTRICT JUDGE

August 26, 2020